727 P.2d 1255

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Patrick E. HALL, Defendant-Appellant.**

**No. 15362.**

Court of Appeals of Idaho.

Oct. 28, 1986.
Petition for Review Denied
Jan. 16, 1987.

Lance D. Churchill, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., by Lynn E. Thomas, Sol. Gen., and A. René Fitzpatrick, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BURNETT, Judge.

On a Saturday night at a Rexburg bar, four men argued over relationships with a woman. Words turned to violence. The altercation spilled into a parking lot. Gunshots rang out. Two men fell dead; another lay critically wounded. The fourth man, Patrick Hall, was arrested and charged with first degree murder. Despite a claim of self-defense, a jury eventually found Hall guilty of second degree murder (two counts) and of aggravated battery. He has appealed.

We are asked to decide (1) whether excessive publicity denied Hall a fair trial; (2) whether the surviving victim should have been allowed to testify about "dreams" of the shootings; (3) whether the trial judge erred in admitting pretrial statements by Hall to the police; and (4) whether the jury received proper instructions regarding "diminished capacity" due to intoxication. For reasons explained below, we affirm the judgment of conviction.

I

We first consider the question of news coverage. The shootings were extensively publicized by the local news media. Before trial, Hall's defense attorney moved for a change of venue. The motion was denied.

Pretrial publicity is a stubborn problem in the administration of criminal justice. It is a product of differing institutional perspectives and conflicting constitutional values. Journalists, motivated by competitive pressures of the marketplace and by the "public's right to know," assert a right under the First Amendment to report accusations of criminal conduct long before the issue of guilt has been resolved. Defense counsel, motivated by a client's self-interest and by deeper concerns about the fairness of our criminal justice system, argue that pretrial publicity abridges the accused's Sixth Amendment right to an impartial jury as well as his closely related Fourteenth Amendment right to due process. When asked to change venue in a criminal case, the trial judge faces the difficult task of balancing these competing forces. Because the task necessarily is imprecise, turning upon circumstances peculiar to each case, it is committed to the trial judge's sound discretion. *E.g., State v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975).

■ Like most discretionary decisions, the judge's ruling on a motion for change of venue is subject to legal limits. An accused person's distress at becoming the object of news media attention—while wholly understandable—affords no basis, by itself, to change venue. On the other hand, a defendant's inability to make a detailed and conclusive showing of prejudice is not a proper ground for refusing to change venue. Prejudice seldom can be established or disproved with certainty. Rather, it is sufficient for the accused to show "a *reasonable likelihood* that prejudicial news [coverage] prior to trial will prevent a fair trial." *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966) (emphasis added). There can be no fair trial unless the issue of guilt is decided by impartial finders of fact. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Consequently, the question posed by a motion to change venue is whether a "reasonable likelihood" exists that pretrial publicity has affected the impartiality of prospective jurors.

■ Impartiality may be affected adversely by the quality or the quantity of pretrial media coverage. Qualitatively, the courts must be concerned with news stories and editorials that are inflammatory, inaccurate or beyond the scope of admissible evidence. *E.g., State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973). The quantitative

impact also must be recognized. When prospective jurors are incessantly exposed to news stories selectively packaged for mass consumption, they may become subtly conditioned to accept a certain version of facts at trial. Such repetitive exposure may diminish the jurors' ability to separate information absorbed before trial from information presented during trial. *State v. Brooks*, 103 Idaho 892, 655 P.2d 99 (Ct. App.1982) (concurring opinion).

■ When a trial judge finds a reasonable likelihood that qualitative or quantitative elements of pretrial publicity have affected the impartiality of prospective jurors, the constitutional balance swings in favor of assuring a fair trial. "[T]he trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell*, 384 U.S. at 362, 86 S.Ct. at 1522. The judge should continue the case until the impact of publicity abates or should transfer the case to another county where publicity has been less pervasive. *Id.* Idaho judges have authority, under I.C. § 19–1801 and I.C.R. 21, to change venue in such situations.[1]

When reviewing a judge's denial of a motion to change venue, we independently examine the record to determine whether there was a "reasonable likelihood" that pretrial publicity adversely affected juror impartiality. Among the factors considered are the existence of affidavits indicating prejudice, or lack of prejudice, in the community where the defendant was tried; testimony at voir dire as to whether any jurors had formed an opinion of the defendant's guilt or innocence based on pretrial publicity; whether the defendant challenged for cause any of the jurors finally selected; the nature and content of the pretrial publicity; and the length of time elapsed between the pretrial publicity and the trial. *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979). We also consider any assurances given by the jurors themselves concerning their impartiality. *State v. Brooks, supra* (lead opinion). However, such assurances are not dispositive. *Sheppard v. Maxwell, supra; Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

■ In the present case, Hall presented no affidavits demonstrating community prejudice arising from media coverage of the case. However, through counsel, he did engage in extensive voir dire of prospective jurors. More than 65 persons were questioned. Of these, 29 were individually sequestered in the judge's chambers and queried on the record about their exposure to pretrial publicity. All 29 professed some recall of news stories concerning the case, but their recollections were vague and nonspecific. Only one person said he had formed an opinion as to Hall's culpability; he was dismissed for cause by the court. Although both the defense and the prosecution used every available peremptory challenge, the record contains no expression by the defense of dissatisfaction with the final twelve jurors selected.

As noted earlier, news coverage of the killings was widespread. Stories appeared in several area newspapers and in radio and television newscasts. The reports were factual and noninflammatory, with one arguable exception. In a television broadcast, a magistrate was quoted as saying that bail would be denied due to "the great amount of evidence which has been collected in this case already."[2] The use

---

1. Idaho Code § 19–1801 provides: "A criminal action, prosecuted by indictment, may be removed from the court in which it is pending, on the application of the defendant, on the ground that a fair and impartial trial cannot be had in the county where the indictment is pending." Idaho Criminal Rule 21(a) states that "[t]he court upon motion of either party shall transfer the proceeding to another county if the court is satisfied that a fair and impartial trial cannot be had in the county where the case is pending."

2. If the quotation was accurate, the magistrate might have been referring obliquely to I.C. § 19–2903, which prohibits bail in capital cases "when the proof of [the defendant's] guilt is evident or the presumption thereof great." However, I.C.R. 46, relating to bail, contains no parallel provision. In any event, bail later was granted to Hall upon the posting of sufficient property bonds.

of this quotation was an unfortunate lapse in journalistic restraint. Nevertheless, it appears that no harm resulted. None of the jurors expressed any recollection of the broadcast.

Moreover, the bulk of media coverage occurred within two months of the shootings. The trial did not commence until nearly a year had elapsed. Although defense counsel made a commendable effort to demonstrate the quantitative impact of media coverage in this case, the record does not show that prospective jurors were incessantly exposed to news stories throughout the pretrial period. The intensity of the initial coverage was dissipated by the passage of time.

The trial judge gave a comprehensive summary of reasons for denying the motion for change of venue. His explanation was consistent with our analysis today. He prudently noted that the motion could be renewed if evidence of prejudice later became available. No such evidence was presented. We conclude that the judge acted within his sound discretion by denying the motion.

■ On a related point, Hall asserts that even if he was not entitled to a change of venue in light of pretrial publicity, a motion to sequester the jury should have been granted in order to prevent outside influence during the trial. The decision whether or not to sequester a jury—like the decision on changing venue—is committed to the sound discretion of the trial judge. I.C. § 19–2126. Here, the judge decided against sequestration. However, he undertook to protect the jury from outside influence by studiously and continuously admonishing them to avoid all discussions about the case and to refrain from reading or listening to any media reports during the trial. The transcript is replete with the judge's admonitions each time the jury prepared to leave the courtroom. In contrast, the record is devoid of any suggestion that the jury actually was exposed to prejudicial information or other improper influence during the trial. Under these circumstances, although it might have been appropriate to sequester the jury, we cannot say that the judge abused his discretion by failing to do so. We conclude that the judge's rulings on venue and sequestration did not deprive Hall of a fair trial.

## II

■ We next address Hall's contention that the trial judge should have excluded testimony from the victim who survived the shootings. The witness, Johnny Pacheco, had been shot in the head. He testified about events before the shootings and about his physical sensations of being wounded. But he expressed uncertainty as to whether his testimony was based on actual memories or on "dreams" after the shootings. Prefacing his testimony, Pacheco said, "I had these two dreams. I am going to call them dreams because I don't know what they were." At another point in his testimony, Pacheco flatly declared that he remembered nothing during the time period from the afternoon before the shootings until he awakened in the hospital with a head wound. These facts frame a twofold issue. Did the court err in admitting Pacheco's testimony? If so, does the error dictate a reversal?

As a general rule, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." I.R.E. 602. When the instant case was tried, this rule was embodied in I.C. § 9–201. The statute provided that witnesses must have the ability to perceive and to communicate their perceptions to others. Construing the statute in *State v. Johnson*, 92 Idaho 533, 447 P.2d 10 (1968), our Supreme Court held that where a witness said he remembered nothing about a certain time period, he effectively declared himself incompetent to answer questions relating to that period.

In this case, Pacheco made such a statement. Recognizing the problem, the trial judge elected to deal with it, not by exclud-

ing the testimony, but by cautioning the jury as follows:

> You should disregard the testimony of Mr. Johnny Pacheco except as it is specifically corroborated in some other respects. The Court instructs this way because of the testimony that he does not remember it. It may have been a dream, but he is not sure, but if it has any relevance, it should be corroborated by other testimony for you to regard it as having any probative value.

Hall now maintains that this admonition failed to remedy the underlying inadmissibility of Pacheco's testimony.

Although the question is a close one, we agree with Hall. The competency of a witness does not turn upon corroboration. The existence of corroborating evidence tends to show that events related by the witness did in fact occur; but it does not show that the witness himself perceived those events. Neither does it establish that testimony by the witness is based on his own perception rather than on information acquired from others. Accordingly, we hold that Pacheco's testimony was admitted in error.

The next question is whether the error mandates a reversal. Rule 52, I.C.R., provides that "[a]ny error ... which does not affect substantial rights shall be disregarded." In determining whether an error has affected substantial rights or is harmless, the inquiry is "whether it appears from the record that the ... [error] contributed to the verdict, leaving the appellate court with a reasonable doubt that the jury would have reached the same result had the [error] not occurred." *State v. Palin,* 106 Idaho 70, 75, 675 P.2d 49, 54 (Ct.App.1983). *See also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (dealing with constitutional error).

■ Here, we find several reasons why the error is harmless. First, although the judge's cautionary statement about corroboration did not render Pacheco's testimony admissible, it did restrict any use of the testimony to points on which there was independent evidence. Second, the state presented extensive testimony from other witnesses about the shootings and surrounding circumstances. Third, Hall admitted the shootings, contending that he acted in self-defense. Finally, Pacheco's testimony was not probative on the only genuinely contested issue at trial—whether Hall's actions somehow were justified. Pacheco described sensations of being shot and he presented a sketchy image of the shooting of another victim. His testimony neither denied nor acknowledged any altercation with Hall; indeed, the testimony contained no specific reference to Hall. In our view, the testimony left the jury unenlightened on the issue of self-defense. This issue was decided on other evidence. We conclude, beyond a reasonable doubt, that Pacheco's testimony did not contribute to the verdict. Its admission was harmless.

### III

Hall's claim of self-defense foundered upon undisputed evidence that he shot the victims a total of nine times. None of the victims was found to have a weapon in hand. Other damaging evidence came from Hall's own mouth. At three different junctures—before he was placed in police custody, while he was in custody but before questioning, and during custodial interrogation—Hall made incriminating statements. In each instance he asserted that he had acted in self-defense, but he also uttered remarks suggesting a different motivation.

Thus, at the scene of the shootings, before he was taken into custody, Hall was heard to exclaim, "They were just a bunch of illegal aliens and we could get rid of a few." While being transported to the police station, Hall spontaneously remarked that the victims were "Mexican bastards," that one of them had injured a woman who was a close friend to Hall, and that the victims "deserved" to be shot. Later, at the police station, Hall received his *Miranda* warnings. After waiving his right to silence and to counsel, he repeated his allegation that one of the victims had harmed his female friend. He stated that

the same victim had been "pushing everybody in Rexburg around long enough."

Hall now contends that these statements should have been suppressed because the police obtained them in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and of his constitutional privilege against self-incrimination. The safeguards prescribed by *Miranda* are well known and need not be repeated here. Adherence to these safeguards is a per se requirement for admissibility of any pretrial statements obtained from the accused during custodial police interrogation. *State v. Moulds,* 105 Idaho 880, 673 P.2d 1074 (Ct.App.1983). Moreover, regardless of whether *Miranda* is applicable and has been satisfied, the statements also must meet the underlying constitutional standard of voluntariness. *State v. Blevins,* 108 Idaho 239, 697 P.2d 1253 (Ct.App.1985).

▮ Here, the *Miranda* safeguards would not apply to statements made at the scene of the shootings, before Hall was taken into custody. Neither would they apply to statements made while Hall was being transported to the police station. At that time he was in custody but had been asked no questions about the shootings. His spontaneous statements in the police car, which an officer noted in silence, were not elicited by interrogation or by its functional equivalent. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The statements made at the police station, during custodial interrogation, are more problematic. Hall acknowledges that he received *Miranda* warnings, and that he waived his rights, at the outset of interrogation. But he contends that the waiver was tainted by intoxication. Indeed, a blood-alcohol test administered with his consent produced a result of .25%.

Any waiver of *Miranda* rights must be made voluntarily, knowingly and intelligently. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). A similar standard applies to waiver of the underlying constitutional privilege against self-incrimination. *E.g., Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Consequently, in determining the validity of both waivers in this case, the common question is whether Hall possessed the capacity to make voluntary, knowing and intelligent decisions despite the influence of alcohol. The district court found that he did.

▮ On appeal, where waiver of a constitutional right is at issue, we conduct an independent examination of the record. *E.g., Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Our review encompasses the totality of circumstances. Intoxication is one such circumstance, but intoxication alone does not automatically signify that a waiver is invalid. *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), *cert. denied,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *see also United States v. Holmes,* 632 F.2d 167 (1st Cir.1980). The record before us contains abundant evidence that Hall was able to make a valid waiver. The pertinent facts are summarized in findings by the district court:

1. The defendant was sufficiently in control of his faculties to accurately shoot the three victims. Every shot fired hit one of the three men involved. Pacheco, the third victim, was a considerable distance from the defendant when he was seriously wounded.

2. Immediately after the shootings, the defendant rationally deliberated whether to stay at the scene and talk with the police or flee the scene in his truck.

3. At the scene of the shootings, on his way to the Rexburg Police Department, and before the interrogation began, the defendant both requested and insisted that ht [sic] be allowed to tell his story.

4. The defendant, in response to questions concerning his state of sobriety, asked the night of the shootings and the day after, maintained that he was sober.

5. A comparison of the taped interview made the night of the shootings and the day after are substantially similar.

6. Several veteran police officers testified that the defendant was not so intoxicated that he was unable to intelligently and voluntarily waive his constitutional rights.

7. Inconsistencies between statements made in the taped interviews could have resulted from the defendant's anxiety and excitement over the events involved in the shooting.

8. Before the first interrogation began the defendant read the Miranda [sic] warning card and stated that he wanted to answer all questioning. Before the second interrogation began, Officer Fowler stated that the defendant "gave them back to me from memory." Before the third interrogation began, the defendant willingly completed and signed a Miranda [sic] waiver after Chief of Police Blair Seipert asked the defendant if he understood his rights and the defendant said that he did. [Citation omitted.]

. . . .

In addition to the foregoing findings and those set forth in the prior ruling of the court on defendant's previous motion to suppress the court further finds that the voluntary, knowing and intelligent waiver of defendant's rights by the defendant is further evidenced by his responsiveness to the various questions propounded to him during interrogation. His answers are generally coherent and understandable. He was cooperative with the police officers investigating the shootings in question and understood and followed their directions. He was able to walk unassisted. His balance was good and his walk was steady. His hand and eye movements were coordinated. He gestured with his hand in coordination with his words. His movements were smooth rather than jerky or hesitant. He was able to identify and remove his driver's license from his wallet without

difficulty on request. He was able to read his rights out loud clearly and correctly.

Because our independent review of the record supports these findings, we accept them. Accordingly, we hold that the trial judge did not err in admitting Hall's pretrial statements.

## IV

Finally, Hall contends that the jury was inadequately instructed on a purported defense of "diminished capacity" due to intoxication. The Idaho Supreme Court long ago rejected the diminished capacity doctrine. *See State v. White*, 93 Idaho 153, 456 P.2d 797 (1969); *State v. Linn*, 93 Idaho 430, 462 P.2d 729 (1969). Moreover, it is well established that voluntary intoxication is not a general excuse for crime. I.C. § 18–116. However, if a specific intent is a necessary element of the crime charged, the jury may take intoxication into account in determining whether the defendant was capable of forming such intent when the crime was committed. I.C. § 18–116; *State v. Gratiot*, 104 Idaho 782, 663 P.2d 1084 (1983); *State v. Johnson*, 74 Idaho 269, 261 P.2d 638 (1953). In a murder case, intoxication may bear on the existence of "malice aforethought." I.C. § 18–4001; *State v. Sprouse*, 63 Idaho 166, 118 P.2d 378 (1941).

Here the trial judge instructed the jury on the issue of intoxication and formation of specific intent. Instruction No. 24 stated:

When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the acts were committed upon which the charge is based, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented

him from forming a specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state.

Instruction No. 42 added:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

These instructions adequately conveyed the meaning of I.C. § 18–116. When coupled with instructions on the elements of murder, they properly required the jury to consider whether Hall had become so intoxicated at the time of the shootings that he could not act with malice aforethought. We hold that the trial judge did not err in refusing to give further instructions concerning the effect of intoxication.

We have considered Hall's argument that the instructions on intoxication impermissibly shifted the burden of proving intent. We find the argument to be meritless, requiring no separate discussion. We similarly reject the broad contention, made in a supplemental brief on appeal, that the instructions as a whole "were weighted in favor of the State of Idaho and prejudicial against the Defendant."

The judgment of conviction is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.