958 P.2d 22

**STATE of Idaho, Plaintiff–Respondent,**

v.

**David M. HAWKINS, Defendant–Appellant.**

**No. 22489.**

Court of Appeals of Idaho.

April 13, 1998.

Robert J. Van Idour, Lewiston, for appellant.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General, Boise, for respondent. Catherine O. Derden argued.

LANSING, Chief Judge.

A jury found David M. Hawkins guilty of the first degree murder of Leslie McKinney committed in Lewiston in December, 1993. In this appeal Hawkins contends that the evidence at his preliminary hearing did not support the magistrate's finding of probable cause to bind him over for first degree murder. He also asserts that the district court erred in admitting at trial evidence found during a warrantless search of a motor home, evidence of a bloody handprint that was allegedly destroyed by a state crime laboratory, certain photographic evidence, and DNA evidence. Hawkins also challenges the district court's refusal to exclude evidence or to grant a continuance due to the State's violation of a pretrial order, and he asserts that the district court erred in excluding testimony about the victim's violent relationship with another man.

## I. BACKGROUND

David Hawkins came to Lewiston, Idaho, in October 1993. He worked at the Hillary Motel, which was owned by his sister, Dorothy Jungert. He slept and kept his possessions in Jungert's motor home, which was parked behind the motel. On December 18, 1993, Leslie McKinney's corpse was found near the Hillary Motel. She had been bludgeoned and strangled. Hawkins was arrested and charged with her murder.

Evidence at his trial indicated that Hawkins' friend, Monte Olson, had introduced Hawkins to McKinney on the evening preceding her death while the three were at a local bar. Hawkins asked Olson to invite McKinney to the motor home for a party later that evening. Hawkins and Olson left the bar and went to Olson's room at the Hillary Motel. At some point, Olson decided not to attend the party, but at Hawkins' request, Olson telephoned McKinney at the bar to find out if she would be coming to the party. Hawkins then left Olson's room.

The next morning, Leslie McKinney's body was found in a wooded area close to the motel, and the police began an investigation. Some time later that day, Dorothy Jungert discovered in a crawl space under the motel a bloodstained bedspread that she recognized as being from the motor home. Jungert's boyfriend, Bill Hubbard, and Olson showed Hawkins the bedspread. Hawkins pulled the bedspread from the crawl space and then said he wanted to get rid of it because his fingerprints were on it. Hubbard refused to destroy the bedspread and sent Olson to call the police to report the discovery. A short time later, Jungert gave Hawkins one hundred dollars, and Hawkins packed a suitcase, got a ride to the bus station, and left town.

Officers Greene and Pedersen of the Lewiston police department responded to Olson's call regarding the bedspread. Officer Greene testified that Jungert and Hubbard told him that Hawkins left town because he was afraid he was in violation of the terms of his parole in Oregon, but that they were not sure where he was going when he left. When officer Greene asked to search the motor home, Jungert agreed and signed a consent form. In the motor home, the police discovered Hawkins' flashlight with a palm print in blood on it. There was also blood elsewhere in the motor home. Hawkins was arrested in Pomeroy, Washington, the night of December 18, 1993, and was charged with first degree murder.

## II. ANALYSIS

### A. Sufficiency of Evidence at Preliminary Hearing

Hawkins first asserts that the State presented insufficient evidence of premeditation at Hawkins' preliminary hearing to support a finding of probable cause on the charge of first degree murder. We decline

to address the merits of this issue. If at a fair trial a defendant has been found guilty beyond a reasonable doubt upon sufficient evidence to sustain the verdict, we do not consider, on appeal, the sufficiency of the evidence presented at the preliminary hearing. *State v. Streeper,* 113 Idaho 662, 664–65, 747 P.2d 71, 73–74 (1987); *State v. Maland,* 124 Idaho 830, 832, 864 P.2d 668, 670 (Ct.App.1993); *State v. Maylett,* 108 Idaho 671, 672, 701 P.2d 291, 292 (Ct.App.1985). As explained below, we conclude that Hawkins received a fair trial, and we therefore do not consider his claims regarding the preliminary hearing.

## B. Search of the Motor Home

■ Hawkins next challenges the propriety of the police search of the motor home. He argues that the district court should have suppressed the bloody palm print on Hawkins' flashlight and other evidence found inside the motor home because the search violated the Fourth Amendment guarantee against unreasonable searches. After hearing evidence at Hawkins' suppression hearing, the district court denied Hawkins' motion on the ground that the officers had obtained valid consent to the search from the motor home's owner, Dorothy Jungert. Hawkins argues that the district court's finding that Jungert had authority to consent to a search of a motor home where Hawkins had been living was erroneous.

■ In evaluating a denial of a motion to suppress, our standard of review is one of deference to factual findings of the trial court unless they are clearly erroneous, while giving free review to the trial court's determination as to whether constitutional standards have been satisfied in light of the facts found. *State v. Pick,* 124 Idaho 601, 603, 861 P.2d 1266, 1268 (Ct.App.1993); *State v. Heinen,* 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct. App.1988). The determination of whether a search is reasonable, and therefore complies with the Fourth Amendment, is a question of law over which we exercise free review. *State v. McIntee,* 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App.1993); *Heinen,* 114 Idaho at 658, 759 P.2d at 949.

■ The Fourth Amendment guarantee against unreasonable searches is implicated when police search premises in which the defendant has a reasonable expectation of privacy. *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Warrantless searches or seizures are presumptively unreasonable unless they come within one of several judicially recognized exceptions to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). Those exceptions include, among other things, searches that are conducted with proper consent, voluntarily obtained. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Whiteley,* 124 Idaho 261, 264, 858 P.2d 800, 803 (Ct.App.1993); *State v. Rusho,* 110 Idaho 556, 558, 560, 716 P.2d 1328, 1330, 1332 (Ct.App.1986). Consent that will justify a warrantless search is not limited to consent given by the defendant; it may be obtained from "a third party who possessed common authority over or other sufficient relationship to the premises." *Matlock,* 415 U.S. at 171, 94 S.Ct. at 993. *See also State v. Johnson,* 110 Idaho 516, 522, 716 P.2d 1288, 1294 (1986). Even if it is later established that the third party lacked actual authority to consent, the search will be upheld if the law enforcement officers reasonably believed that such authority existed. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *State v. McCaughey,* 127 Idaho 669, 672, 904 P.2d 939, 942 (1995). *See also United States v. Hamilton,* 792 F.2d 837, 842 (9th Cir.1986) (upholding search based upon government agent's reasonable belief that third party had authority to consent); *United States v. Sledge,* 650 F.2d 1075, 1081 (9th Cir.1981) (articulating apparent authority exception to warrant requirement and holding that officer reasonably believed that the tenant had abandoned apartment and that landlord therefore had authority to consent to search); *United States v. Lopez–Diaz,* 630 F.2d 661, 666–67 (9th Cir.1980) (holding that police officer may act upon reasonable, good

faith belief that third party had authority to consent to search of motor home). The conduct of the officers must be "judged against an objective standard: would the facts available to the officers at the moment ... 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Rodriguez,* 497 U.S. at 188, 110 S.Ct. at 2801. The Court in *Rodriguez* further explained:

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.
>
> . . . .
>
> Whether the basis for ... authority [to consent to a search] exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably.

*Id.* at 186, 110 S.Ct. at 2800 (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Hence, we need not address the scope of Dorothy Jungert's actual authority over the motor home that had been occupied by Hawkins; rather, we will examine the reasonableness of the law enforcement officer's belief in that regard.

At the suppression hearing in this case officer Greene testified as follows concerning the information that he received before he conducted the search.

> When we got out there we talked to Mr. Olson and also talked to a Bill Jungert. That's not right. It was Dorothy Jungert and Bill Hubbard. They told us that this bedspread had been—had come out of their motorhome which was a Bounder motorhome which was parked a short distance from the motel. They told me that Dorothy Jungert's brother, David Hawkins, had been living in the motorhome, and that they had confronted him about this bedspread. That he had gotten extremely nervous, that he had wanted to destroy the bedspread, and that they told

him that, no, they—they were not going to destroy this bedspread because they felt it was evidence in the murder of Miss McKinney and that if [Mr. Hawkins] had any reason why he didn't want to be around when the police got there he had best leave.

> . . . .

> Dorothy Jungert gave him some money. They packed—he packed his belongings and he was given a ride to the Super 8 Motel where the bus station is. After learning this and that the bedspread was identified as being from the motorhome, we asked who owned the motorhome and Mrs. Jungert said that she did. And we asked her for consent to search that motorhome. And she signed a consensual search form for myself and detective Pedersen to search the motorhome for any more evidence of the crime.

According to officer Greene's testimony, Hubbard then produced a key that he was carrying on a key ring and unlocked the motor home door to admit the officers.

Thus, the officers knew that Jungert, Hawkins' sister, was the owner of the motor home; that her boyfriend possessed a key to the vehicle; that Hawkins had been staying in the motor home with Jungert's permission; and that Hawkins had, with suddenness, packed his bags and departed with the intent of catching a bus out of town under circumstances suggesting that he was fleeing to avoid arrest for the murder of Leslie McKinney. Although there was some suggestion that Hawkins was allowed to occupy the motor home in exchange for his work at the motel, no information suggesting that Hawkins was a formal tenant under a lease or rental agreement was given to the officers or presented at the suppression hearing.

The foregoing facts would give rise to a reasonable belief on the part of the officers that Jungert owned the motor home, that Hawkins had left the motor home in her control, that Hawkins would have expected Jungert to enter and make use of the motor home in his absence, and that Jungert therefore had authority to consent to a search of the vehicle. It follows that the district court

properly denied Hawkins' motion to suppress evidence derived from the search.[1]

## C. Photographic Evidence

■ We next address Hawkins' challenge to the admission of certain photographs. He asserts that the district court abused its discretion in admitting three photographs of the victim's body taken from varying distances. He argues that these photos were cumulative and excessively prejudicial and therefore should have been excluded pursuant to Idaho Rule of Evidence 403.[2]

In *State v. Winn*, 121 Idaho 850, 828 P.2d 879 (1992), the Idaho Supreme Court held:

It is well established that where allegedly inflammatory evidence is relevant and material as to an issue of fact, the trial court must determine whether the probative value is substantially outweighed by the danger of unfair prejudice. The determination of whether to admit evidence challenged on the ground that it is more prejudicial than probative is clearly within the trial court's discretion. The trial court has discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the corpus delicti, the extent of injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime. The fact that the photographs depict the actual body of the victim and the wounds inflicted on the victim and may tend to excite the emotions of the jury is not a basis for excluding them.

*Id.* at 853, 828 P.2d at 882 (citations omitted).

■ A lower court's ruling on a Rule 403 objection to evidence will not be disturbed on appeal unless it is shown to be an abuse of discretion. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App.1989). The photos at issue here showed the crime scene and were probative of the cause of death. Because they showed ligature marks on the victim's neck resulting from strangulation, they were also probative of the defendant's intent to kill. Thus, they were an aid to the jury in arriving at a fair understanding of the evidence. *State v. Martinez*, 92 Idaho 183, 188, 439 P.2d 691, 696 (1968). Hawkins has not shown that the probative value of this evidence was exceeded by an unfair prejudicial impact. Further, although there is some repetition among the three photos, we do not find them unduly cumulative. Therefore, we hold that it was not an abuse of the court's discretion to admit all three. *See State v. Fenley*, 103 Idaho 199, 203, 646 P.2d 441, 445 (Ct.App. 1982).

■ Hawkins also asserts error in the admission of a photograph showing speaker wire inside a car that was parked near where McKinney's body was found. Hawkins argues that the photo lacked probative value. We disagree. Officer Greene testified that the wire shown in the photograph was similar to wire used to strangle McKinney. The photograph was relevant to show that Hawkins had access to wire similar to that used in the murder. Additionally, because the car was located at least several feet from the victim and the murderer would have had to walk to the car to get the wire in order to use it in strangling McKinney, the photo contributes toward proving that Hawkins had time to premeditate, a material element of the State's case. Finally, the photograph carries not the slightest danger of unfair prejudice, for all it depicts is wire on the

---

1. We note that the "automobile exception" provides a possible alternative basis for upholding the search. In *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the United States Supreme Court held that under certain circumstances a motor home will fall within the automobile exception. *See also Hamilton*, 792 F.2d at 842. However, neither party in the instant case has referred to the automobile exception at the suppression hearing or in this appeal.

2. I.R.E. 403 states:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

floor of an automobile. The district court did not err in admitting this photograph.

### D. The Palm Print

■ At trial, the State introduced photographs of Hawkins' bloody palm print on a flashlight found in the motor home. Testimony established that the flashlight belonged to Hawkins and that the blood was type A, Leslie McKinney's blood type.[3] The palm print was photographed by the State's fingerprint expert, whose uncontroverted testimony established that photographing prints in blood is standard procedure and is the best way to memorialize and examine such prints. After photographing, the flashlight was sent to the State serology laboratory for testing of the blood. As a result of the serological testing, the palm print was rendered unusable for further print analysis. Further serological testing was possible, however. Based upon this chain of events, Hawkins contends that the State unjustifiably destroyed the palm print. This conduct, he contends, was a violation of the State's duty under the due process clause to preserve potentially exculpatory evidence for use by the defendant. *See Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Stuart v. State,* 127 Idaho 806, 907 P.2d 783 (1996); *State v. Holden,* 126 Idaho 755, 757, 890 P.2d 341, 343 (Ct.App.1995). As a consequence, he argues, the court should have suppressed the evidence of the print or given an instruction allowing the jury to infer that the destroyed evidence was favorable to Hawkins' defense.

Hawkins' argument is without merit, for the uncontroverted testimony established that the palm print was *not* destroyed but was, in fact, photographically preserved for further analysis. Indeed, the evidence suggested that photographing is the best means of preserving and analyzing blood prints on a dark surface. At trial the State used this photograph, not the actual flashlight, to make the comparison to Hawkins' known palm print. The defense had access to both the photograph and the flashlight in order to

perform its own independent analysis of the print and blood testing prior to the trial. Therefore, the evidence was appropriately preserved, and Hawkins was not deprived of useful evidence.

### E. Hearsay Testimony

■ It was the defense's theory at trial that Monte Olson, not Hawkins, had murdered McKinney. In furtherance of this theory, the defense attempted to present the testimony of Eric McKinney, the victim's son, to show that Olson had bruised McKinney on at least one occasion. According to an offer of proof, Eric McKinney would have testified that he had seen bruises on his mother's face and arm, and when he asked her how she got the bruises, she responded, "Monte." The district court excluded this evidence of Leslie McKinney's response under I.R.E. 802 as hearsay. Hawkins acknowledges that the statement was hearsay, but argues that it should have been admitted under the I.R.E. 803(24) hearsay exception, which authorizes the admission of:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

■ A trial court has broad discretion in deciding whether to allow hearsay evidence under Rule 803(24). This Court will not overturn the exercise of that discretion absent a clear showing of abuse. *State v. Zimmerman,* 121 Idaho 971, 974, 829 P.2d 861, 864 (1992). *See also State Dep't of Health & Welfare v. Altman,* 122 Idaho 1004, 1007, 842 P.2d 683, 686 (1992). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the

---

3. Hawkins' blood type was identified as type O.

lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

In excluding Eric McKinney's testimony, the trial court explained that the relevance of the statement was marginal, that it was not more probative than any other available evidence since Monte Olson was available and had given testimony on the subject, and that the statement attributed to the victim was ambiguous. We agree with these observations. It is apparent that the trial court understood the issue to be a discretionary one and correctly applied the guiding principles of I.R.E. 803(24). In addition, we note that the first criteria of Rule 803(24), that the statement carries circumstantial guarantees of trustworthiness equivalent to those of the other Rule 803 hearsay exceptions, is not satisfied here. The offer of proof did not describe anything in the circumstances under which the statement was made by the victim that would give the statement an aura of truthfulness or reliability. Accordingly, we find no error in the exclusion of Eric McKinney's hearsay testimony. .

## F. DNA Evidence

The State's evidence in this case included results of several DNA tests. The first was performed on vaginal swabs from Leslie McKinney's body. The State's expert, Renee Romero, testified that the DNA pattern in semen found on the swabs was the same as the DNA pattern in Hawkins' blood and that this pattern occurs in the general population with a frequency of one in half a million people. The second test was performed on semen samples from a tee shirt found in a dumpster near the corpse. Romero testified that this semen sample exhibited the same DNA pattern found in Hawkins' blood sample and that the frequency of that pattern occurring in the general population is one in forty-five thousand. Romero explained that the disparity between the first two results

was due to time constraints which prevented her from testing the entire sample in the second test. The third test was performed on blood also found on the tee shirt. Romero testified that the blood matched the DNA pattern in Leslie McKinney's blood sample and that the frequency of that pattern occurring in the general population was one in one hundred and twenty thousand. The fourth test was performed on blood located on a brick found near McKinney's corpse. Romero said that the DNA pattern of this blood also matched that of Leslie McKinney's blood, and occurred in the general population with a frequency of one in one hundred and twenty thousand. The remaining DNA tests excluded Monte Olsen as the source of the blood on the brick, the blood on the tee shirt, and the semen on the tee shirt.

In November 1994, approximately two months prior to the trial, the district court issued a discovery order requiring the State to deliver the results of all tests to the defense on or before December 19, 1994. The results of tests on all of the items except the brick and the tee shirt were disclosed to the defendant in compliance with this order. However, Hawkins' attorney visited the laboratory where the tests were being conducted for the State on December 19, 1994, and learned that the DNA tests on the brick and the tee shirt had just begun and would not be concluded for some time. The State did not receive these test results until January 25, 1995, and did not disclose them to the defense until January 26, after the trial had begun.

### 1. Untimely disclosure of DNA evidence

The first issue regarding the DNA evidence relates to the prosecutor's violation of the court's pretrial order requiring production of all of the State's test results on or before December 19, 1994. Far from complying with this order, the prosecutor did not even deliver some of the items to the laboratory for DNA testing, a process that takes several weeks to complete, until the very day of the disclosure deadline. Consequently, it was not until January 26, 1995, more than one month after the court-ordered deadline

and three days into the jury trial, that the State delivered to the defense the results of the tests. Upon receiving the tests in mid-trial, Hawkins' attorney moved to exclude evidence of these test results as a sanction for the State's violation of the pretrial order or, in the alternative, for a continuance to conduct his own DNA tests and to consult with his expert regarding the new test results proffered by the State. Hawkins' attorney acknowledged that he had been aware since December 19, 1994, that the State was subjecting the brick and the tee shirt to tests and that he could have arranged for testing on these items earlier. He argued, however, that he did not request tests of these items because he was relying upon the court's pretrial order with the expectation that test results disclosed after December 19 would be inadmissible, and, further, that he had no reason to expend resources for independent tests until the State had produced inculpatory test results.

The district court declined to exclude the new DNA evidence or to allow a continuance. The court did, however, postpone cross-examination of the State's DNA expert until the following day in order to allow defense counsel time to consult with his expert regarding the newly produced test reports. Hawkins asserts error in the denial of his alternative motions to exclude the evidence or for a lengthy continuance.

 We begin by identifying the proper standard for our review of the trial court's decision. The choice of an appropriate sanction, or whether to impose a sanction at all, for a party's failure to comply with a discovery request or order is within the discretion of the trial court. *State v. Stradley,* 127 Idaho 203, 208, 899 P.2d 416, 421 (1995); *State v. Smoot,* 99 Idaho 855, 859, 590 P.2d 1001, 1005 (1978); *State v. Buss,* 98 Idaho 173, 174, 560 P.2d 495, 496 (1977); *State v. Matthews,* 124 Idaho 806, 812, 864 P.2d 644, 650 (Ct.App.1993). The disposition of a motion for a continuance is likewise committed to the discretion of the trial court and will not be overturned on appeal unless a clear abuse of discretion is shown. *State v. Richardson,* 95 Idaho 446, 511 P.2d 263 (1973); *State v. Saunders,* 124 Idaho 334, 336–37, 859

P.2d 370, 372–73 (Ct.App.1993). Our Supreme Court has held that "unless an appellant shows that his substantial rights have been prejudiced by reason of a denial of his motion for continuance, appellate courts can only conclude that there was no abuse of discretion." *State v. Laws,* 94 Idaho 200, 202, 485 P.2d 144, 146 (1971). When the issue is one of late disclosure of evidence, the inquiry on appeal is whether the lateness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving a fair trial. *Smoot,* 99 Idaho at 859, 590 P.2d at 1005 (1978); *State v. Hansen,* 108 Idaho 902, 904, 702 P.2d 1362, 1364 (Ct.App.1985). Hence, our review in this case turns upon whether Hawkins has demonstrated that the late disclosure of the test results regarding the brick and the tee shirt caused prejudice that was not alleviated by the court's short postponement of the cross-examination of the State's DNA expert. Prejudice is not demonstrated by a mere claim that additional investigation or testing could have been conducted. *State v. Tapia,* 127 Idaho 249, 255, 899 P.2d 959, 965 (1995); *Hansen, supra.* "To prove prejudice, a defendant must show there is a reasonable probability that, but for the late disclosure of evidence, the result of the proceedings would have been different." *Tapia, supra.* See also *State v. Spradlin,* 119 Idaho 1030, 1034, 812 P.2d 744, 748 (Ct. App.1991).

 This Court is disturbed by the State's noncompliance with the district court's pretrial order, particularly in a case where the State was asking for imposition of the death penalty. When it becomes apparent to a prosecutor that, for any reason, he or she cannot comply with a court-ordered deadline for production of evidence, the appropriate action is to notify the court, seek relief from the order and, if necessary, request a postponement of the trial. In the present case, however, we are constrained to affirm the district court's denial of Hawkins' motion for exclusion of the evidence or for a continuance, for there is nothing in the record indicating that Hawkins was actually prejudiced by the late disclosure. Defense counsel argues that Hawkins was prejudiced

by the inability to conduct independent tests, but this is not substantiated by the record. Hawkins has not shown that his presentation to the jury would have differed in any respect if the State's disclosure of these DNA tests had been timely or if Hawkins had been granted a lengthy continuance. That ·is, Hawkins has not shown that independent tests would have been exculpatory or that with a continuance he would have been able to conduct a more effective cross-examination of the State's expert or present a more effective challenge to the State's tests through the testimony of his own DNA expert. The circumstances presented here demonstrate only a potential for prejudice, not realized prejudice.

■ We recognize that it may be impossible for defendants in Hawkins' position to show actual prejudice from the trial record alone. This underscores the importance of taking appropriate post-trial steps to create the necessary record to support an appeal. Rather than relying solely on the trial record and asking this Court to speculate as to whether the defendant was prejudiced by the trial court's denial of a continuance or sanctions, the better practice is to move for a new trial in the district court, pursuant to I.C. § 19–2406(5) or (7), taking that opportunity to present to the trial court test results, affidavits, or other evidence that would demonstrate prejudice from the court's earlier denial of an adequate remedy for the State's untimely disclosure. Such a post-trial measure would not only allow development of the necessary record for appeal, but may obviate the need for an appeal by giving the trial court an opportunity to grant a new trial where prejudice can be demonstrated.

### 2. Challenges to the Foundation for DNA Evidence

■ Hawkins also filed a pretrial motion to exclude all of the State's DNA evidence on the grounds that, due to alleged flaws in the testing technique and method of statistical analysis employed by the State's expert, the test results were not shown to be scientifically valid and reliable. The district court denied the motion, and the State ultimately presented the DNA evidence described above.

On appeal, Hawkins points out that scientific evidence, which is governed by I.R.E. 702, is admissible only if an adequate foundation is laid to show its reliability and accuracy. *See State v. Faught,* 127 Idaho 873, 875–77, 908 P.2d 566, 568–70 (1995); *State v. Rodgers,* 119 Idaho 1047, 1049, 812 P.2d 1208, 1210 (1991); *State v. Parkinson,* 128 Idaho 29, 33–35, 909 P.2d 647, 651–53 (Ct.App.1996). Hawkins argues that this standard was not met with respect to the State's DNA evidence for two reasons. First, he asserts, the data base used by the expert to determine the frequency of the DNA patterns in the general population was flawed. In particular, Hawkins contends that the data base could not provide an accurate portrayal of the frequency of DNA patterns because the population sample was too small; that the method used to gather data for the data base did not assure accuracy in the ethnic identification of those included; and that the data base excluded population sub-groups, including Asians and Native Americans. Hawkins argues that the exclusion of Native Americans from the data base was of particular importance because the populous in the Lewiston region, where this crime occurred, includes a substantial number of Native Americans. Second, Hawkins contends that the "product rule" and the "ceiling principle," methods of statistical analysis used by the State's expert to determine the probability of another person having the same ·DNA pattern as Hawkins or McKinney, are not accurate and have not gained general scientific acceptance. Because of these alleged flaws in the methodology of the State's expert, Hawkins urges that the DNA evidence should have been excluded because it lacked an adequate foundation and because any probative value it might possess was outweighed by the danger of unfair prejudice.

The district court conducted a two-day hearing on Hawkins' motion to exclude the DNA evidence. Experts for both sides testified at length regarding complex scientific factors that bear upon the reliability of DNA evidence. On the basis of this testimony, the district court issued a memorandum decision presenting a thorough analysis of the evi-

dence and a detailed explanation of the court's decision that Hawkins' challenges went to the weight rather than the admissibility of the evidence. Hawkins now asks this court to find that the district court erred in its analysis. We are disinclined, however, to venture into this thicket of scientific issues when it is apparent that, even if at the conclusion of that undertaking we were to find that the evidence should have been excluded, such a finding would not require reversal of the judgment of conviction.

If there was an error in the admission of evidence, it would mandate reversal only if the challenged evidence affected the substantial rights of the defendant. I.C.R. 52; *State v. Woodbury,* 127 Idaho 757, 761, 905 P.2d 1066, 1070 (Ct.App.1995); *State v. Cliff,* 116 Idaho 921, 924, 782 P.2d 44, 47 (Ct.App.1989). An error will be found to have affected the substantial rights of a defendant if it appears from the record that the error contributed to the verdict, leaving the appellate court with a reasonable doubt that the jury would have reached the same result had the error not occurred. *Woodbury, supra; State v. Brazzell,* 118 Idaho 431, 435, 797 P.2d 139, 143 (Ct.App.1990); *State v. Hall,* 111 Idaho 827, 832, 727 P.2d 1255, 1260 (Ct.App.1986). In the present case, we are persuaded beyond a reasonable doubt that the result of the trial would not have been different if the DNA evidence had been excluded.

Even without the challenged DNA test results, the evidence of Hawkins' guilt was overwhelming. Witnesses testified that Hawkins was with McKinney at a bar the evening before her body was discovered and that she was invited to come that same night to a party at the motor home where Hawkins was staying. Her body was found a short distance from the motor home, and a source of wire similar to that used to strangle McKinney was also found nearby. In the motor home, police found Hawkins' flashlight with his palm print in blood that matched Leslie McKinney's blood type.[4] Police also discovered blood on a pillow case, the floor, the wall, and the door handle of the motor home. The bloody bedspread found under the motel was identified as having come from the motor home. Drops of blood on the victim's socks were of Hawkins' blood type. Several witnesses testified that upon learning of the discovery of McKinney's body, Hawkins became extremely nervous and shaky and broke down in tears. When the bloody bedspread was discovered, Hawkins wanted to destroy it. Moreover, when Hawkins learned that the police would be called regarding the bedspread, he immediately packed his belongings and left the state.

Given this evidence, we are convinced beyond a reasonable doubt that the jury would have found Hawkins guilty of the murder even if it had not heard the DNA-related testimony. Therefore, without reaching the question of whether error occurred, we conclude that the admission of the challenged DNA evidence did not affect Hawkins' substantial rights and, even if erroneous, could not be grounds for reversal.

## G. Cumulative Error

Lastly, Hawkins urges this court to reverse the judgment of conviction based upon the cumulative error doctrine. Under that doctrine, even when individual errors are deemed harmless, an accumulation of such errors may deprive a defendant of a fair trial. *State v. Martinez,* 125 Idaho 445, 453, 872 P.2d 708, 716 (1994). However, a finding of cumulative error must be predicated upon an accumulation of actual errors. *State v. Medina,* 128 Idaho 19, 29, 909 P.2d 637, 647 (Ct.App.1996). Given our disposition of each of the alleged errors asserted by Hawkins, the doctrine is inapplicable in this case.

## III. CONCLUSION

In our judgment, Hawkins has not demonstrated reversible error in the proceedings below. Therefore, the judgment of conviction is affirmed..

PERRY, J., and CAREY, J. Pro Tem., concur.

---

4. The typing of the blood on the flashlight and the blood on the victim's socks was done by conventional serological testing, not by DNA analysis.