**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAXWELL HOFFMAN,
             *Petitioner-Appellant,*

v.

ARVON J. ARAVE, Warden, Idaho
Maximum Security Institution,
Department of Correction, State of
Idaho,

             *Respondent-Appellee.*

No. 02-99004

D.C. No.
CV-94-00200-S-
BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
November 22, 2005—Pasadena, California

Filed July 5, 2006

Before: Harry Pregerson, William A. Fletcher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Pregerson

7331

## COUNSEL

Joan M. Fisher, (argued and brief) Federal Defenders of Eastern Washington and Idaho, Moscow, Idaho, and Ellison Matthews (brief), Boise, Idaho, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, Idaho, for the respondent-appellee.

---

## OPINION

PREGERSON, Circuit Judge:

The petitioner, Maxwell Hoffman, appeals the denial of his 28 U.S.C. § 2254 habeas petition based on ineffective assistance of counsel during pre-trial plea bargaining and during the guilt phase of his trial for the murder of Denise Williams. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. We affirm in part and reverse in part.

## I. Factual Background

The facts of the murder of Denise Williams have been recounted in numerous prior decisions in state and federal courts,[1] and are recited only briefly here. Hoffman was employed by Richard Holmes, a drug dealer. Williams, a police informant, initiated a controlled buy with Holmes, and as a consequence, Holmes was arrested for distributing controlled substances. After Holmes was released on bail, Sam Longstreet and Jeff Slawson, two of Williams's friends, went to meet with Holmes to assure him that they had nothing to do with his arrest. Holmes brokered a deal for these two friends to deliver Williams to Holmes at a camp in Idaho.

Longstreet and Slawson dropped Williams off and left her with Ron Wages, one of Holmes's associates. Thereafter, Hoffman and Holmes went to the camp and met up with Wages and Williams. Holmes kicked Williams in the head,

---

[1] *See Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001); *Hoffman v. Arave*, 73 F. Supp. 2d 1192 (D. Idaho 1998); *Hoffman v. Arave*, 973 F. Supp. 1152 (D. Idaho 1997); *Hoffman v. State*, 121 P.3d 958 (Idaho 2005); *State v. Hoffman*, 851 P.2d 934 (Idaho 1993).

and told Williams that she was "a dead bitch." Holmes told Hoffman and Wages, "You know what to do," and left.

Hoffman, Wages, and Williams drove around for several hours. Hoffman and Wages forced Williams to write letters exonerating Holmes of the controlled substances charges. At some point, Hoffman stopped the car and took Williams into a cave. He cut her throat while Wages waited in the car. As Hoffman was coming back to the car, Williams began to crawl up an embankment near the cave. Wages ran over to Williams, and stabbed her with the knife Hoffman was carrying. Wages then began to bury her with rocks, and Hoffman joined in. The evidence showed that Williams might have eventually died either from the original cut by Hoffman or from the wound inflicted by Wages, but that the actual cause of death was a blow from a rock.

Hoffman and Wages then drove to Wages's sisters' house, where the two cleaned the car, and burned their clothes and Williams's clothes. Later, at Holmes's house, Hoffman cut up the knife with a cutting torch.

## A. Idaho State Proceedings

On August 22, 1988, Hoffman was charged with first-degree murder. The court appointed William Wellman as counsel. Wellman had never tried a murder case, and had no formal training on defending capital cases. At the time he was selected to represent Hoffman, Wellman had done contract work with the Owyhee County public defender's office for several years, and criminal defense work constituted about half of his practice.

Five weeks before trial, the State offered Hoffman a plea bargain: If Hoffman would plead guilty to first-degree murder, the State would not pursue the death penalty. The State also made clear that it intended to seek the death penalty if Hoffman rejected the plea agreement. Wellman advised Hoff-

man that he should reject the plea agreement. Wellman believed that the Idaho death penalty scheme was unconstitutional based on *Adamson v. Ricketts*, 865 F.2d 1011, 1023-28 (9th Cir. 1988) (en banc), *abrogated by Walton v. Arizona*, 497 U.S. 639 (1990), where this court found Arizona's death penalty scheme unconstitutional. Wellman saw no material difference between Arizona's death penalty scheme and the death penalty scheme in Idaho. He thus recommended that Hoffman reject the plea agreement because he believed it was only a matter of time until Idaho's death penalty scheme would be declared unconstitutional as well. Hoffman took Wellman's advice and rejected the plea agreement.

In February 1989, only three weeks before trial, the court appointed co-counsel Charles Coulter. Coulter had tried two vehicular manslaughter cases, but that was the extent of his homicide experience. He had no experience with capital cases.

The guilt phase of Hoffman's trial commenced on March 7, 1989. The jury heard eight days of testimony. Defense counsel presented no evidence of Hoffman's mental capacity on the night of Williams's murder. Instead, Wellman and Coulter's central strategy was to paint Wages as the more culpable of the two.[2] After five hours of deliberation, the jury returned a conviction for first-degree murder and found a sentencing enhancement, making Hoffman "death eligible."

The sentencing phase of the trial began on June 9, 1989. After weighing the aggravating and mitigating circumstances,

---

[2]At trial, Wages was one of the principle witnesses against Hoffman; in exchange for Wages's testimony, the prosecution agreed not to seek the death penalty against Wages. Both Longstreet and Slawson pleaded to second-degree kidnaping charges. The prosecution recommended a sentence of at least six months in jail, and each received a sentence of only one year in jail. Holmes was originally charged with kidnaping as well, but was killed in prison before he was brought to trial. Thus, in the end, the State pursued the death penalty only against Hoffman.

the court imposed the death penalty.[3] On July 25, 1989, Hoffman filed a post-conviction petition in state court. The state court denied the petition. On January 29, 1993, the Idaho Supreme Court affirmed Hoffman's sentence. *See Hoffman*, 851 P.2d at 945.

## B.  Federal Habeas Proceedings

Hoffman filed an initial habeas petition in the United States District Court for the District of Idaho on December 1, 1994. On June 13, 1997, the district court dismissed several claims on the grounds of procedural default. On December 28, 1998, the district court dismissed the remainder of the claims on their merits. On January 3, 2001, we concluded that Hoffman's ineffective assistance of counsel claims were not procedurally barred. *See Hoffman*, 236 F.3d at 535-36. We also held that Hoffman's pre-sentencing interview conducted by the state probation officer was a "critical stage" of the proceeding, during which the Sixth Amendment right to counsel attached. *See id.* at 540-41. We remanded for further evidentiary hearings on Hoffman's ineffective assistance of counsel claims, and for a finding whether the deprivation of counsel during the pre-sentencing interview was harmless. *See id.* at 542-43. We affirmed dismissal of the remainder of Hoffman's claims. *See id.*

On remand, the district court held a five-day evidentiary hearing. The court heard substantial expert testimony about Hoffman's mental capacity, and testimony from Hoffman's trial counsel. After hearing oral argument by both parties, the district court granted Hoffman's habeas petition in part and

---

[3]The Idaho death penalty scheme in existence at the time of Hoffman's sentencing called for the judge, not a jury, to decide whether the death penalty was warranted. *See State v. Charboneau*, 774 P.2d 299, 315-17 (Idaho 1989), *withdrawn and superseded by* 861 P.2d 67 (Idaho 1993). To impose the death penalty, the court had to find that the mitigating factors, considered cumulatively, did not outweigh the gravity of each aggravating factor, considered separately. *See id.*

denied it in part. The district court rejected three of Hoffman's ineffective assistance of counsel claims, specifically that counsel: (a) failed to challenge Hoffman's competency to stand trial; (b) advised Hoffman to reject a plea agreement that would have foreclosed the State from seeking the death penalty; and (c) failed to investigate or present evidence of Hoffman's diminished capacity at trial.

But the district court did accept one of Hoffman's ineffective assistance of counsel claims: that Hoffman had received ineffective assistance of counsel during sentencing. The district court found that Wellman and Coulter had not sufficiently investigated and presented mitigation evidence at sentencing that might have kept the trial judge from imposing a death sentence. The district court also found that the state trial judge's decision to deprive Hoffman of counsel during the pre-sentence interview was not harmless because it "dictated" trial counsels' sentencing strategy. The district court granted the habeas petition on these two claims and ordered the State to re-sentence Hoffman within 120 days of its order.

On April 4, 2002, after the district court issued its decision, the court issued a separate order stating that it had "fulfilled the mandate of the Ninth Circuit Court of Appeals" and therefore denied several motions Hoffman had filed after the evidentiary hearing, including a motion to amend his habeas petition and to expand the record. Hoffman requested, and was granted, a Certificate of Appealability ("COA") on his claim that he received ineffective assistance before and during trial. The district court denied a COA with respect to its denial of Hoffman's post-hearing motions to amend the habeas petition and to expand the record.

Both parties appealed. Before us, Hoffman argued, again, that he received ineffective assistance of counsel before and during trial, and requested that we grant a COA with regard to the denial of his post-hearing motions. The State cross-appealed the district court's grant of the habeas petition for

ineffective assistance of counsel at the sentencing phase. The State subsequently withdrew its cross-appeal, leaving in place the district court's order granting the habeas petition as to the sentencing phase.

Thus, the only questions remaining for this court are: (a) whether Hoffman was denied effective assistance of counsel during the plea-bargaining stage or during the guilt phase of trial; and (b) whether a COA should be granted with regard to Hoffman's post-hearing motions.

## II. Ineffective Assistance of Counsel Claims

Hoffman initiated federal review of his state conviction and sentence on May 2, 1994, before the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Thus, the more stringent review requirements of AEDPA do not apply. *See Caswell v. Calderon*, 363 F.3d 832, 836 n.3 (9th Cir. 2004). Under pre-AEDPA standards, an ineffective assistance of counsel claim is a mixed question of law and fact that we review *de novo*. *See Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir. 2000) (en banc).

[1] An ineffective assistance of counsel claim has two components. First, the defendant must show that counsel's conduct was not " 'within the range of competence demanded of attorneys in criminal cases.' " *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)). Under this standard, we review only whether "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "strong presumption that counsel's conduct [falls] within the wide range of reasonable representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1987) (as amended) (citations omitted). Because there exist "countless ways to provide effective assistance in any given case," we will not second-guess tactical decisions made by counsel. *Strickland*, 466 U.S. at 689 (citations omitted). Nor

will we evaluate counsel's conduct through "the distorting lens of hindsight." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (as amended) (citations omitted). Rather, we review counsel's actions based on the facts as known to the attorney, or as reasonably could have been known to the attorney, at the time he or she acted. *See Strickland*, 466 U.S. at 690.

**[2]** Second, the defendant must show that counsel's deficient performance caused prejudice. Counsel's deficient performance must be so significant "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant need not prove definitively that the outcome would be different, but only a "reasonable probability" of a different result. *Id.* at 693-94. A reasonable probability is a probability "sufficient to undermine confidence in the outcome," a showing *less* than a preponderance of evidence. *Id.*

Under this rubric, we consider Hoffman's ineffective assistance of counsel claims. On appeal, Hoffman contends that his trial counsel was ineffective for three distinct reasons: (a) for failing to investigate and challenge, during the guilt phase of trial, Hoffman's capacity to form the intent to commit the crime of first-degree murder;[4] (b) for failing to investigate and to challenge his competency to stand trial; and (c) for recommending that he reject the plea bargain offer. We will consider each in turn.

---

[4]As discussed in more detail below, Idaho does not have an affirmative defense based on either diminished capacity or intoxication. *See* Idaho Code § 18-207(a) (1989); *compare id.* § 18-207(c) (1989). Instead, a defendant's capacity to commit a crime is folded into the element of intent: the State must show, beyond a reasonable doubt, that the defendant had the capacity to form the intent to commit the crime for which he is charged. *See id.* § 18-4003; *State v. Beam*, 710 P.2d 526, 621-22 (Idaho 1985). For ease of discussion, however, we refer to Hoffman's claim that his counsel should have challenged his intent to commit the first-degree murder as a "diminished capacity defense."

## A. Ineffective Assistance in Failing to Investigate and to Present a Diminished Capacity Defense

Hoffman contends that his attorneys were deficient in failing to investigate and to raise a diminished capacity defense. We agree with Hoffman that trial counsel were deficient in failing to investigate a diminished capacity defense, and therefore that Hoffman has met the first prong of the *Strickland* test. We hold, however, that no prejudice resulted from his trial counsels' deficient performance.

[3] To meet the first prong of *Strickland*, Hoffman must show that his counsel had reason to know that Hoffman's mental capacity might be at issue in the case. *See Hendricks*, 70 F.3d at 1043 ("[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition . . . without a supporting strategic reason, constitutes deficient performance."). We do not expect counsel to be trained in psychology or mental health. In this case, however, Wellman and Coulter's interactions with Hoffman provided them significant clues that would put a reasonable lawyer on notice that Hoffman's capacity to form the intent to commit first-degree murder was at issue.

[4] Both Wellman and Coulter recognized that Hoffman had some level of cognitive difficulty. Both testified that their communications with Hoffman were stinted, and that Hoffman had difficulty answering questions. Wellman testified that he recognized that Hoffman had a "pretty low" IQ and that he had difficulty understanding their discussions. He stated: "[G]enerally speaking, as I sit here today and try to put myself back into that time period of the five months or so prior to trial, it was fairly — it should have been evident to me that there were some serious psychiatric problems with Max [Hoffman]." Coulter similarly explained: "[O]ver a period of a week or two or however many weeks it was . . . I came to realize, just based on my own lay experience, that [Hoffman] had a problem." In fact, Hoffman's counsel testi-

fied that part of the reason they decided not to have Hoffman testify at the guilt phase of trial was because of his mental limitations. Surely, then, Hoffman's attorneys were on notice that Hoffman's mental capacity might be at issue.

**[5]** In addition, Hoffman's explanation as to why he slit Williams's throat was facially illogical and should have indicated to counsel that Hoffman was not entirely well. Hoffman told Wellman and Coulter that when he took Williams into the cave and slit her throat, he was trying to save her life. He claimed that he believed that if he slit her throat superficially, she would stay in the cave, he could get Wages to leave, and that she could take herself to safety. The logic is, of course, faulty, given that Williams would be left bleeding in the middle of nowhere with no means of communication. This illogical explanation should have put Hoffman's trial attorney on notice that Hoffman's mental capacity might be at issue.

**[6]** Third, counsel knew that Hoffman had a history of drug abuse. Wellman testified that he remembered "clear indication of fairly steady, regular use of crank," or methamphetamine, by Hoffman. In addition, counsel knew that Hoffman had ingested significant amounts of drugs on the night of Williams's murder. The amount of drugs alone probably should have led counsel to investigate whether Hoffman might have been intoxicated and whether this intoxication might have affected Hoffman's ability to form the intent to commit first-degree murder.

**[7]** Based on these facts, we believe that counsels' performance fell below an objective standard of reasonableness because reasonable counsel in this situation would have recognized that Hoffman's capacity on the night of Williams's murder might have been affected by mental health problems, by drug use, or by some combination of the two. Once counsel was on notice that Hoffman's capacity on the night of Williams's murder was at issue, counsel had an absolute duty "to make reasonable investigations or to make a reasonable deci-

sion that [made] investigations unnecessary." *Strickland*, 466 U.S. at 668, 691; *see also Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."). In this case, both Wellman and Coulter admitted that they did not conduct a factual investigation into Hoffman's mental capacity, nor did they research the viability of a diminished capacity defense. Wellman himself admitted that he "probably didn't give the [diminished capacity] defense due consideration." This failure fell below the objective standard of reasonableness.

We cannot agree with the district court that such failure was tactical or that counsel made a "reasonable decision that [made] investigations unnecessary." *See Strickland*, 466 U.S. at 668, 691. The record does not reflect a calculated decision by counsel not to investigate a diminished capacity defense. Wellman testified that he was "not sure [they] really had a good cogent theory of defense." To the extent that counsel had a theory, the theory was that Wages was the principal perpetrator of the offense because Wages had engaged in sexual intercourse with Denise Williams on the night of the murder and was trying to cover it up. That is, the theory was that because Hoffman was less culpable than Wages, then Hoffman, like Wages, should be spared the death penalty. Wellman, however, was unable to sufficiently develop this theory. And even if counsel had been able to develop this theory, the theory is not a defense to first-degree murder where an aider and abetter is just as criminally liable as the one who deals the fatal blow. *See* Idaho Code § 18-204 (1989); *State v. Gonzalez*, 12 P.3d 382, 384 (Idaho Ct. App. 2000). A diminished capacity defense in Idaho could have negated the intent element required for first-degree murder, and, if successful, could have spared Hoffman's life. Thus, counsels' decision — if it can be called that — to forego a diminished capacity defense to pursue a strategy that would not result in a lesser charge falls outside the range of tactical decisions.

Moreover, pursuing a diminished capacity defense is not inconsistent with trial counsels' theory of the case. Rather, a showing that Hoffman was suffering from psychosis or intoxication would have furthered counsels' argument that Wages was the more culpable of the two, and could only have supported counsels' sentencing strategy. We can see no tactical disadvantage to investigating a diminished capacity defense, a defense with a plausible factual basis that might have allowed Hoffman to escape first-degree murder and would have, in any event, furthered counsels' strategy.

The State tries to paint counsels' behavior as a strategic decision of where to focus money and resources. This is contradicted by counsels' own admissions that they did not have a clear theory of defense, and that they were "just kind of spinning" in the weeks and months before trial. Moreover, if Wellman and Coulter failed to develop a diminished capacity defense because they lacked funds, this evidences a more serious deficiency: a failure to understand controlling law. Wellman testified that they did not ask for an investigator or for a mental health expert because they did not think the judge would have granted such a request. But in *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), the Supreme Court held that where an indigent defendant can demonstrate that his mental capacity is likely to be a "significant issue" at trial or capital sentencing, he has an absolute right to be provided with psychiatric and psychological expert assistance. We agree with the district court, then, that "standards of professional competent assistance required [counsel] to request funds which would allow for adequate investigation or to preserve the issue for appeal." Thus, the failure to investigate and present a diminished capacity defense at trial cannot be forgiven based on the lack of resources available to Wellman and Coulter.

For these reasons, we conclude that Hoffman has met the first prong of *Strickland*; he has shown that it was objectively

unreasonable for counsel not to investigate a diminished capacity defense.

[8] But this is not enough for Hoffman to succeed on his ineffective assistance of counsel claim. He must also show a "reasonable probability" that the outcome of the trial would have been different had counsel investigated his mental capacity. *Strickland*, 466 U.S. at 693-94. Where counsels' deficiency involves the failure to investigate a possible defense, we evaluate whether there is a "reasonable probability" that a competent investigation would have turned up evidence bearing on that defense that would have affected the outcome of trial. *See Stankewitz v. Woodford*, 365 F.3d 706, 717-19 (9th Cir. 2004) (focusing the prejudice inquiry on the information that a reasonable investigation would have unearthed).

It is apparent that Hoffman suffered and continues to suffer some degree of mental disability. Eight years before Williams was murdered, Hoffman was committed for six days in the Metropolitan State Hospital in Norwalk, California, where he was diagnosed as suffering from "psychosis manifested by delusional and violent behavior." At the habeas hearing, before the district court, Hoffman offered the expert testimony of three doctors who each testified that Hoffman likely had some degree of psychotic thought disorder in 1989. The doctors also agreed that this illness might affect Hoffman's ability to reason. As Dr. Merikangas, a psychiatrist and neurologist, explained, psychosis is a "formal thought disorder where the person's thinking is not consistent with reality and with logical thought as experienced by normal people. It is generally characterized by problems with logic, problems with abstracting ability, sometimes with hallucinations." More important for our purposes, Dr. Merikangas testified that congenital brain damage visible on MRIs taken in 1996 and in 2001 could have been detected had an MRI been taken of Hoffman's brain in 1989.

This expert testimony of these three doctors is supported by the testimony of Dr. Sanford, the psychologist who examined Hoffman before his sentencing hearing in 1989. Dr. Sanford wrote, in his 1989 report, that his initial meeting with Hoffman left him with the impression that "some brain damage or neurological problem [might be] responsible for the types of difficulties he was showing on the initial assessment," especially his difficulty in communicating. After further testing, Dr. Sanford concluded that Hoffman's symptoms were consistent with "brain damage to the left hemisphere." This report is as close to a contemporaneous mental health evaluation as exists, and indicates that a reasonably competent investigation in 1988 could have adduced evidence to support a diminished capacity defense during the guilt phase.

The State presented the testimony of Dr. Smith, a neurosurgeon, who opined that the MRI scans fell within the normal range. At the same time Dr. Smith admitted that he rarely read MRIs and that it was not his specialty. While the evidence is somewhat ambiguous, we believe Hoffman probably could have presented some evidence that would have supported a finding that he suffered from some degree of psychosis at the time of Williams's murder.

In addition to evidence of psychosis, there is significant evidence that Hoffman's IQ fell within the range of mental retardation. The clinically-accepted range of mental retardation is an IQ score of 70, with a five point margin of error. *See Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002). Hoffman's IQ has fluctuated between 72 when tested in 1989 and 74 when tested in 2001. The district court properly concluded, then, that Hoffman was "borderline retarded." This evidence could have been presented in 1989.

In addition, Hoffman had a significant history of drug abuse. Counsel knew that Hoffman used methamphetamine and cocaine at least four times on the day of Williams's murder. Expert testimony was presented in the district court about

the effect of drug use on a person with psychosis: that drug use frequently induces a person with psychosis to have more "florid psychosis and delusions." This evidence also could have been presented at the guilt phase of trial in 1989.

But even if we were to assume that all of the above testimony could have been presented at trial, there is not a "reasonable probability" that such evidence would have altered the outcome of the guilt phase of Hoffman's trial. Idaho's law is more demanding than most states' laws on the question of mental capacity. In Idaho, at the time of Hoffman's trial (as now) there was no "diminished capacity," "intoxication," or "insanity" defense. *See* Idaho Code § 207(a) (1989). Rather mental capacity was folded into the element of intent: the prosecution was required to prove, beyond a reasonable doubt, that the defendant had the mental capacity to form the intent to commit the crime charged. *See State v. Card*, 825 P.2d 1081, 1085-86 (Idaho 1991). Section 18-115 of the Idaho Code, as it existed at the time of Williams's murder, states that intent is "manifested by the circumstances connected with the offense, *and the sound mind and discretion of the accused*." Idaho Code § 18-115 (1989) (emphasis added). Thus, diminished capacity and intoxication are not "general excuse[s]" for crime, but the jury can consider such factors as they relate to whether the defendant was able to form the intent to commit the crime for which he was charged. *See State v. Hall*, 727 P.2d 1255, 1262-63 (Idaho Ct. App. 1986).

Hoffman was charged with first-degree murder and with aiding and abetting first-degree murder, and the jury was instructed on both theories. Accordingly, to find prejudice, we would have to conclude that there is a reasonable probability that evidence of Hoffman's mental capacity would negate not only the intent to murder Williams, but would also negate the intent to "knowingly assist [or] facilitate" Williams's murder. *See State v. Paradis*, 676 P.2d 31, 40 (Idaho 1983). We cannot do so.

First, we note that Hoffman had the mental capacity to complete several intentional acts on the night of the murder. Hoffman drove around for several hours, and he changed a flat tire on a car. While there was testimony presented to the district court that a person in a drug-induced psychosis can perform certain simple motor functions, this is nonetheless good evidence that Hoffman had some level of mental functioning on the night of Williams's murder. In addition, on that same night, Hoffman destroyed evidence of the murder: he burned his, Williams's, and Wages's clothing, he helped to clean the car, and he cut up the weapon. Such behavior indicates some level of cognitive planning — a recognition of criminal behavior — and cuts against a diminished capacity defense.

Second, Hoffman bragged about the murder to his cohorts. Hoffman told Ricky Williams, a cellmate, that he had "slashed" Williams's throat, and that he had killed Williams. Hoffman also told Kenneth Hunnicutt, a friend and cellmate, that he cut Williams's throat, and that because she "wouldn't die" Wages threw a rock at her. Victor Gezzi, another friend, testified that Hoffman told him that Williams "was took care of" and that he had cut Williams's throat. Hoffman's act of telling others that he was the perpetrator of the crime is inconsistent with his testimony that he was trying to help Williams by slitting her throat. Thus, Hoffman's admissions would likely have discredited a diminished capacity defense in the jury's mind.

Third, if Hoffman had contested his capacity to form the intent to participate in Williams's murder, evidence of a subsequent crime that Hoffman committed could have been admissible. Four months after Denise Williams was murdered, Hoffman, Holmes, and Wages together kidnaped a man named Ricky Simonis. On that occasion, Hoffman drove the car, and later held Simonis while Wages beat him. Hoffman then held a gun to Simonis's head while Simonis signed the title of his car over to Holmes. *See State v. Hoffman*, 776 P.

2d 1199 (Idaho Ct. App. 1989). Evidence of this kidnaping was excluded at the trial, but might have been admitted under Idaho law if Hoffman had challenged the element of intent in the instant case. *See State v. Dayley*, 531 P.2d 1172, 1173-74 (Idaho 1975) (holding that where a defendant challenges his mental capacity to form criminal intent, other criminal actions may be admissible to prove the defendant's intent or "rationality" at the time of the crime); *see also* Idaho R. Evid. § 404(b); *State v. Pizzuto*, 810 P.2d 680, 688-89 (Idaho 1991), *rev'd on other grounds by State v. Card*, 825 P.2d 1081 (Idaho 1991) (affirming admission of both prior and subsequent bad acts under Idaho R. Evid. 404(b)). Williams's murder was not Hoffman's first foray into the criminal justice system — a fact that would have come to light had Hoffman raised a diminished capacity defense.

Finally, we consider Wellman's evaluation, that his "experience with the makeup of the juries in Owyhee County led [him] to believe that it was not the type of jury makeup that would be attracted to a more mental-capacity-oriented case." Wellman stated that he doubted that he "could persuade a bunch of farmers and ranchers that [there was] voluntary intoxication to the point that you [could not] form the intent to commit the crime." While Wellman's statement might be discounted somewhat, given his lack of experience in capital cases, Wellman had been a member of the Idaho criminal bar for ten years before he represented Hoffman, and his evaluation about the likelihood that the jurors would accept this defense is entitled to some weight.[5]

---

[5]In evaluating Hoffman's claims based on diminished capacity and competency, we do not rely on Hoffman's testimony at the sentencing phase of his trial. It is not clear whether Hoffman would have testified had he not been deprived of counsel at his pre-sentencing interview, which was found by the district court to constitute a violation of his Sixth Amendment right to counsel. Testimony by Hoffman's counsel indicates that they called Hoffman to testify, in part, with the goal of undoing the damage that had been done in the pre-sentencing interview. The district court also found that the deprivation of counsel during the pre-sentencing interview dictated counsels' strategy at sentencing. Accordingly, we do not base our holding here on any statements Hoffman made at sentencing.

**[9]** While it is impossible to divine exactly what might sway a jury in any given situation, we do not believe that a jury would have found that Hoffman was not capable of forming the intent to murder Williams, or at least to knowingly participate in her murder. The fact that he had the cognitive ability to recognize that he should cover up evidence of Williams's murder, that he was able to perform functions such as driving and changing a tire, and that he was involved in Simonis's kidnaping during the same period indicate that Hoffman probably had sufficient capacity to know what he was doing and what the end result of his conduct would be. We do not believe there is a "reasonable probability" that a jury would have found otherwise. Accordingly, we conclude that Hoffman was not prejudiced by his counsels' deficient performance in failing to investigate and present a diminished capacity defense.

## B. Ineffective Assistance in Failing to Contest Hoffman's Competency

Hoffman claims that his attorneys were ineffective because they did not contest his competency to stand trial. We conclude that Hoffman was not prejudiced by his attorneys' failure to move for a competency hearing, and thus decline to consider whether trial counsel's conduct fell below an objective standard of reasonableness under the first prong of *Strickland*.

**[10]** A person is competent to stand trial if he understands the proceedings and is able to assist counsel in his defense. *See Dusky v. United States*, 362 U.S. 402, 402 (1960). Competency requires "the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping to prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001) (citing *Dusky*, 362 U.S. at 402).

Our above finding, that counsel had reason to doubt Hoffman's mental capacity, does not inexorably lead to the con-

clusion that Hoffman was incompetent to stand trial. The standard for competency to stand trial is lower than the standard for capacity to commit a crime. *United States v. Flynt*, 756 F.2d 1352, 1365 n.11 (9th Cir. 1985). Those with mental disorders "frequently know the difference between right and wrong and are competent to stand trial," even if they are regarded as less culpable because of their mental capacity. *Atkins*, 536 U.S. at 318. As such, we have held that those with mental deficiencies are not necessarily incompetent to stand trial. *See Boyde v. Brown*, 404 F.3d 1159, 1166-67 (9th Cir. 2005). In this case, we find that there is no reasonable probability that the court would have found Hoffman incompetent to stand trial.

Wellman admitted that he "had concerns about [Hoffman's] ability to follow, to take in info[rmation] and respond to it." Wellman noted Hoffman's passive nature, that he would often nod along even when things were going over his head. Counsel also noticed that Hoffman had difficulty orally expressing himself and presented an "odd" theory of why he slit Denise Williams's throat. At the same time, both trial counsel testified that Hoffman had some ability to describe what happened to Williams and to discuss his role and the role of others in her murder. As Wellman put it, Hoffman understood the facts of the case against him, even if he did not always understand the law. Based on that description of Hoffman's capabilities, it is unlikely that counsel could have convinced the court that Hoffman was incompetent to stand trial.

[11] In addition, observations of Hoffman by those around him at the time of his trial also suggest that Hoffman would not have been found incompetent to stand trial. For example, Dr. Sanford, the expert who interviewed Hoffman in 1989 prior to sentencing, testified that he did not note any "frank" indications of incompetence. Indeed, Hoffman himself testified, at his post-conviction hearing in December 1989, that "to the best of his knowledge" he had followed what was going on during trial and that he understood his attorneys'

strategy. Given counsels' assessment of Hoffman's ability, Dr. Sanford's evaluation of Hoffman near the time of trial, and Hoffman's own evaluation of his competency during the trial, we do not believe that Hoffman would have been declared incompetent, had his attorneys moved for a competency hearing.

The record indicates that Hoffman had difficulty understanding the aider and abettor theory of liability. But competency to stand trial requires an understanding of the *factual* basis of the proceedings, and does not require mastery of technical legal knowledge. *See Godinez v. Moran*, 509 U.S. 389, 402 (1993); *see also Allard v. Helgemoe*, 572 F.2d 1, 4 (1st Cir. 1978) (concluding that a defendant's inability to understand the intent element of a crime did not render him incompetent). Hoffman's difficulty in accepting the culpability of indirect participants to a crime would not have made him incompetent to stand trial.

**[12]** In short, we conclude that Hoffman has not proved an ineffective assistance claim based on his counsels' failure to challenge his competency because there is not a reasonable probability that Hoffman would have been found incompetent. Because Hoffman was not prejudiced by his counsels' conduct, we affirm the district court's finding that Hoffman was not denied the effective assistance of counsel when his attorneys failed to move for a competency hearing.

## C. Ineffective Assistance in Counseling Hoffman Regarding the Plea Offer

Finally, Hoffman claims that he received ineffective assistance of counsel during the plea bargaining process. On this claim, we conclude that Hoffman did receive ineffective assistance of counsel when Wellman advised him to reject the plea agreement offered by the prosecution.[6]

---

[6]At the time the State offered Hoffman this plea agreement, Coulter had not yet been appointed as co-counsel. Thus, only Wellman was involved in advising Hoffman to reject the plea agreement.

1. *Deficient Performance of Counsel*

On February 6, 1989, the Owyhee County prosecutor proposed that Hoffman plead guilty to first-degree murder in exchange for an agreement by the State not to pursue the death penalty against Hoffman during sentencing. The offer was set to expire on February 16, 1989. Wellman advised Hoffman to reject the plea agreement.

Wellman based his advice on our en banc decision in *Adamson v. Ricketts*, 865 F.2d at 1029-39, filed on December 22, 1988, about six weeks before the plea offer was tendered. In *Adamson*, we held that Arizona's death penalty scheme was unconstitutional because it permitted sentencing facts to be found by the judge, and not the jury. *See id.* at 1023. Wellman noted the similarities between the Arizona statute found unconstitutional in *Adamson* and the Idaho death penalty statute. *See* Idaho Code § 19-2515 (1989). Based on *Adamson*, he advised Hoffman that he was unlikely to receive the death penalty because it was only a matter of time before Idaho's death penalty scheme would also be, in his view, found unconstitutional.

On January 9, 1989, before the prosecutor tendered the plea offer to Hoffman on February 6, 1989, the State of Arizona had already signaled its unhappiness with our ruling in *Adamson* by petitioning for rehearing. On February 1, 1989, this court stayed the mandate in *Adamson* pending the Supreme Court's disposition of the State's anticipated petition for certiorari to the Supreme Court. When Hoffman let the prosecutor's offer lapse on February 16, 1989, the State had not yet filed a petition for certiorari in *Adamson*, but it was a virtual guarantee that the State would do so.

[13] On February 2, 1989, four days before the prosecutor tendered the plea offer, the Supreme Court of Arizona filed its decision in *State v. Walton*, 769 P.2d 1017 (Ariz. 1989), *overruled in part by Ring v. Arizona*, 536 U.S. 584, 603 (2002),

in which it reaffirmed its earlier view that jury sentencing was not constitutionally required in death penalty cases, directly contrary to our decision in *Adamson*. *See Walton*, 769 P.2d at 1030. Thus, on February 16, 1989, when Hoffman let the prosecutor's offer lapse, there was a clear and direct conflict between the Arizona Supreme Court's decision in *Walton* and our decision in *Adamson*. The State of Arizona had already clearly signaled its intention to appeal our decision in *Adamson*, and it was not hard to guess that the defendant in *Walton* would do the same.

Indeed, certiorari was sought in both cases. In October 1989, the Supreme Court granted certiorari in *Walton*, holding in abeyance the petition in *Adamson*. *See Walton v. Arizona*, 493 U.S. 808 (1989). On June 27, 1990, the Supreme Court affirmed the Arizona Supreme Court's decision in *Walton*, thereby directly upholding the constitutionality of Arizona's judge-sentencing scheme in capital cases, and implicitly upholding the comparable Idaho scheme. *See Walton v. Arizona*, 497 U.S. 639, 647-49 (1990).[7] Then, on June 28, 1990, the Supreme Court denied the petition for writ of certiorari in *Adamson*. *See Lewis v. Adamson*, 497 U.S. 1031 (1990).

We do not fault Wellman for failing to predict the outcome of these divergent opinions. We do not expect counsel to be prescient about the direction the law will take. *See Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (holding that a lawyer is not ineffective for failing to anticipate a decision in a later case); *Cooks v. United States*, 461 F.2d 530, 532 (5th Cir. 1972) ("Clairvoyance is not a required attribute of effective representation.").

---

[7]Of course, the Supreme Court has since reversed itself, holding in *Ring v. Arizona*, 536 U.S. 584, 603 (2002), that the judge-sentencing scheme is, after all, unconstitutional in death penalty cases. But the Court has also held that *Ring* is not to be applied retroactively, *see Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), providing no help to those, like Hoffman, who were sentenced to death under the old judge-sentencing scheme.

Nor was it unreasonable for Wellman to draw a connection from the Arizona death penalty scheme to the Idaho scheme. The same fault that the Ninth Circuit identified in Arizona death penalty law was present in Idaho's law: both permitted the sentencing judge to sentence a defendant to death based on the judge's own factual findings. In short, then, Idaho's statute and Arizona's statute were materially indistinguishable. *See Charboneau*, 774 P.2d at 316-17 (declining to adopt *Adamson* even though the court found no material difference between Idaho's scheme and Arizona's scheme). Indeed, several of Wellman's colleagues in the Idaho state bar argued in Idaho state courts that Idaho's statute was unconstitutional under *Adamson. See, e.g., id.*; *State v. Lankford*, 781 P.2d 197, 206-07 (Idaho 1989). Thus, Wellman was not unreasonable in drawing a connection between our decision in *Adamson* and Hoffman's case.

We nonetheless find that Wellman's representation of Hoffman during the plea bargaining stage was deficient for two reasons: first, Wellman based his advice on incomplete research, and second, Wellman recommended that his client risk much in exchange for very little.

**[14]** The first problem is that Wellman based his advice solely on a reading of *Adamson* and not on an understanding of the general landscape in which that case arose. Wellman testified that he had read Idaho Supreme Court capital cases, and therefore he must have known that the Idaho state courts had considered and consistently rejected claims similar to *Adamson. See State v. Fetterly*, 710 P.2d 1202, 1208 (Idaho 1985)*; State v. Creech*, 670 P.2d 463, 473-74 (Idaho 1983), *rev'd in part*, *Arave v. Creech*, 507 U.S. 463 (1993); *State v. Sivak*, 674 P.2d 396, 398-99 (Idaho 1983). With minimal research, he would have discovered that a pair of cases was well on its way to the Idaho Supreme Court that would challenge the continuing viability of these Idaho Supreme Court cases in light of our holding in *Adamson. See State v. Fain*, 774 P.2d 252 (Idaho 1989); *Charboneau*, 774 P.2d at 315-17

(reaffirming *Creech*, decided April 4, 1989, less than two months after Hoffman rejected the plea agreement).

**[15]** Had Wellman researched Arizona law, he would have discovered that on February 2, 1989, after *Adamson*, but before Hoffman rejected the plea offer, the Arizona Supreme Court reaffirmed the constitutionality of Arizona's death penalty scheme. *See Walton*, 769 P.2d at 1030-31. A judge who concurred in *Walton* recognized that the decision might set up a conflict between Arizona law and Supreme Court precedent and cited the Ninth Circuit's decision in *Adamson*. *See id.* at 1039 (Feldman, V.C.J., concurring). With the state of the law in turmoil both in Arizona and in Idaho, and with conflicts between this court and the state supreme courts of both states, a reasonable attorney would have recognized the substantial risk of advising a client to reject a plea agreement. Because Wellman possessed a deficient understanding of the law, he led Hoffman to believe that his sentence would be the same whether he accepted the plea bargain or was convicted at trial. Such advice was constitutionally deficient. *See Cullen v. United States*, 194 F.3d 401, 403-04 (2d Cir. 1999); *Meyers v. Gillis*, 142 F.3d 664, 666-68 (3d Cir. 1988).

If there was a high probability that Hoffman was not going to receive the death penalty, Wellman might have been reasonable in considering our decision in *Adamson* as an additional reason to reject the plea agreement. But Hoffman's chance of receiving the death penalty was not minimal, a fact that counsel vastly underestimated and that made counsel's failure to investigate *Adamson* more disastrous. Under the plea agreement, Hoffman would have given up his right to challenge the first-degree murder charge based on aider and abetter liability. But Wellman admitted that his central strategy at trial — that Hoffman was less culpable than other participants in the murder, especially Wages — could also support a first-degree murder charge. Thus, Wellman advised his client to go to trial and risk the death penalty even though there was a good possibility that the guilt phase of trial would

result in a first-degree murder charge, the same outcome as the plea agreement. This was a huge risk in light of the potential downside, that is, that the court could impose the death penalty. In contrast, under the plea agreement, Wellman could have argued his client's lesser culpability at sentencing while ensuring that Hoffman would not receive a death sentence.[8] Considering the magnitude of the gamble that Wellman was advocating, Wellman's failure to fully research the landscape surrounding *Adamson* constituted deficient performance.

[16] We certainly do not mean to imply that counsel is ineffective in relying on our precedent or in arguing for a reasonable extension of this court's decisions. In this case, however, counsel advised Hoffman to give up the certainty of avoiding the death penalty so that he could go to trial, a risky proposition with a substantial downside. More importantly, he offered this flawed advice without conducting reasonable research into the legal landscape. We therefore conclude that Wellman's legal representation of Hoffman during the plea bargaining stage was not objectively reasonable.

### 2. *Prejudice*

As stated above, deficient performance by counsel is not a sufficient basis to reverse. Hoffman must also show that he was prejudiced by his counsel's deficient performance. Hoffman must show that there is a reasonable probability that he would have accepted the plea agreement had he received accurate advice from his attorney. *See Strickland*, 466 U.S. at 694; *Nunes v. Miller*, 350 F.3d 1045, 1054 (9th Cir. 2003);

---

[8]In Idaho in 1989, a defendant convicted of first-degree murder could be sentenced to death or to a life sentence. *See* Idaho Code § 18-4004 (1989). Where the judge imposed a life sentence, the judge also had to determine a period of confinement, at least ten years, in which the defendant would not be eligible for parole. *See id.* Thus, under the plea agreement, Hoffman's counsel would have had full latitude to argue to the judge that Hoffman's culpability in Williams's murder warranted life with the possibility of parole.

*Cullen*, 194 F.3d at 403; *Wanatee v. Ault*, 259 F.3d 700, 704 (8th Cir. 2001). We hold that there is a "reasonable probability" that the outcome of the proceedings would have been different had counsel acted competently.

Wellman testified that Hoffman had a "compliant personality," and would frequently defer to Wellman's decision-making. Wellman testified that, throughout the process, Hoffman would say "Well, Bill, you are the lawyer, you know, you know more about it than I do." Coulter also testified that Hoffman would frequently defer to their decisions about how the defense ought to be managed. This strongly suggests that, had Wellman fully presented Hoffman's options and told Hoffman that he was giving up very little in exchange for the security of the death penalty being off the table, Hoffman probably would have gone along with Wellman's suggestion and would have accepted the plea agreement.

The State argues that, regardless of Wellman's advice, Hoffman would not have taken the plea agreement because Hoffman wanted the State to prove the charges against him. The State points to Wellman's testimony:

> I would describe [Hoffman as being] of the old school. He was not . . . going to snitch on anybody, he was not going to turn on anybody. And if the State charged him, then they needed to prove it.

The State's argument pulls Wellman's testimony out of context. In the next sentence, Wellman admitted that he did not know whether Hoffman had insisted on going to trial in any previous criminal proceeding. He then explained that Hoffman was surprised that he was indicted, because he "perceived himself as being out of the circle" of those responsible for Williams's murder, i.e., Holmes and Wages. As such, Wellman explained, "he needed to see the evidence that the State had in order to satisfy his mind or convince him[self]" that the State had a case against him.

**[17]** When read in this light, Hoffman's desire to have the State prove its case was not a principled stand against accepting a plea agreement. Rather, Hoffman's misunderstanding of aiding and abetting liability led him to believe that the State was not likely to prove a first-degree murder charge against him. Had Hoffman been presented with an accurate evaluation (1) of the very real possibility of receiving the death penalty at the end of the penalty phase; (2) of the very real chance that the Idaho death penalty scheme would be upheld; and (3) of the almost nonexistent chance that if he had gone to trial he could have achieved anything better than the result promised in the plea agreement, there is more than a reasonable probability that he would have accepted the plea. Therefore, we find that Hoffman suffered prejudice because of his counsel's inadequate performance.

### 3. *Remedy*

Because we find that Hoffman was deprived of the effective assistance of counsel, we must determine the proper remedy. A habeas remedy "should put the defendant back in the position he would have been in if the Sixth Amendment violation had not occurred." *United States v. Blaylock*, 20 F.3d 1458, 1468 (9th Cir. 1994) (as amended). Where a defendant is deprived of the opportunity to make a reasoned decision about a proffered plea agreement, the proper remedy is reinstatement of the offer of the plea agreement. *See id.* at 1468-69; *see also Nunes*, 350 F.3d at 1056-57.

**[18]** Accordingly, we order the district court to direct the State to release Hoffman unless, within a reasonable time from the date of this opinion, the State offers Hoffman a plea agreement with the "same material terms" offered in the original plea agreement. *Nunes*, 350 F.3d at 1057.

### III.   Uncertified Issues

Hoffman has requested that we expand the COA to consider two additional issues: (a) whether the district court abused its discretion in denying Hoffman's motion to amend his petition; and (b) whether the district court abused its discretion when it denied Hoffman's motion to expand the record.[9]

A COA should be granted where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' " *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

### A.   Motion to Amend the Habeas Petition

On February 7, 2002, after the district court held an evidentiary hearing on Hoffman's habeas petition but before oral argument, Hoffman moved to amend his habeas petition. Hoffman wished to amend the language of his ineffective assistance claim to include the following language:

> As a result of his mental states, including retardation and congenital and drug-induced psychosis, Petitioner's admissions regarding his presence and participation in the offense are suspect and should have

---

[9]In his opening brief, Hoffman raised a third uncertified issue, challenging whether *Ring v. Arizona*, 536 U.S. 584, 598 (2002), should apply retroactively to his death sentence. Hoffman conceded that the issue was relevant only if we reversed the district court's order granting the habeas petition on the grounds of ineffective assistance of counsel at the sentencing phase. Because the State withdrew its cross-appeal on grant of the habeas petition on the sentencing phase, we do not consider the Petitioner's *Ring*-related request for a COA.

included further investigation into the truth of Peti-
tioner's statements, all of which would have called
into question the reliability of admissions made by
Petitioner, raising a reasonable doubt as to Petition-
er's guilt and giving the jury evidence to support a
finding of actual innocence.

Thus, Hoffman sought to add a claim of ineffective assistance
based on his counsels' failure to raise a factual innocence
claim.

Hoffman also sought permission to add three additional
claims, each contending that the death penalty, as applied to
him, violated the Eighth Amendment prohibition on cruel and
unusual punishment because he is mentally retarded. The lat-
ter amendment was requested shortly after the Supreme Court
granted certiorari in *Atkins v. Virginia*, 543 S.E.2d 312 (Va.
2000), on the same issue. *See Atkins v. Virginia*, 533 U.S.
976, 976 (2001).[10] Instead of permitting Hoffman to amend
his habeas petition to include these *Atkins*-related claims, the
district court ruled in Hoffman's favor on a different ground
and then denied the motion to amend the petition.

A district court "shall grant leave to amend freely 'when
justice so requires.' " *Lopez v. Smith*, 203 F.3d 1122, 1130
(9th Cir. 2000) (en banc) (citing Fed. R. Civ. P. 15(a)). A dis-
trict court may deny leave to amend based on "the presence
of any of four factors: bad faith, undue delay, prejudice to the
opposing party, and/or futility." *Griggs v. Pace Am. Group,
Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

Given our holding above, Hoffman will almost certainly
not be subject to the death penalty, assuming he accepts the

---

[10]In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), filed after the district
court's decision in this case, the Supreme Court held that execution of the
mentally retarded violates the Eighth Amendment's prohibition against
cruel and unusual punishment.

plea agreement. Thus, Hoffman's request to amend his petition to add *Atkins*-type claims is moot. We are left with Hoffman's request to add an actual innocence claim to his habeas petition. We will grant the COA, in that reasonable minds could differ over whether the district court should have permitted Hoffman to amend his habeas petition to include an actual innocence claim.

**[19]** We find, however, that the district court did not abuse its discretion in refusing to allow Hoffman to amend his claim. The legal basis for Hoffman's actual innocence claim is "tenuous." *See Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004) (finding that the district court did not abuse its discretion when it denied petitioner's request to amend his habeas petition to include a "tenuous" claim). Given the amount of evidence showing that Hoffman knowingly and intentionally participated in Williams's murder, we do not believe that counsel was objectively unreasonable in failing to investigate an actual innocence theory premised on the reliability of Hoffman's admission. The likelihood of success on such a claim was minimal given the amount of evidence — outside of Hoffman's admissions — showing that Hoffman was present at the scene and participated in Williams's murder. For the same reason, Hoffman suffered no prejudice from his counsel's failure to raise an actual innocence claim, because there is not a reasonable probability that the jury would have accepted such a claim. Accordingly, the district court's refusal to allow Hoffman to add such a tenuous ineffective assistance of counsel claim at such a late hour was not an abuse of discretion.

## B.   Motion to Expand the Record

Hoffman also challenges the district court's denial of his motion to expand the record. Given the district court's time constraints, the court asked both parties to consider presenting testimony in the form of deposition transcripts instead of examination in open court. After the evidentiary hearing but

before oral argument, Hoffman filed a motion to expand the record to include: (a) deposition testimony of Levi Martinez and Don Sherman, both of whom testified that Holmes told them that Hoffman was being set up to take the fall for Williams's murder; (b) the declarations of Renee Lundquist and Richard Simonis, who each testified that Hoffman had been held responsible for other criminal acts by Holmes and Wages; and (c) the pre-sentence interview of Richard Holmes, in which he admitted that he often got others to do his "dirty work" for him. This evidence, Hoffman alleged, would support his claim of actual innocence. The state stipulated to admission of the depositions of Martinez and Sherman, but challenged admission of the remaining documents. After rendering its decision on the habeas petition, the district court summarily denied Hoffman's motion to expand the record.

It is not clear why the district court did not allow Hoffman to introduce these documents, especially those the State had stipulated were admissible. Apparently, the district court did not see these documents as useful to its decision, and "having fulfilled the mandate of the Ninth Circuit," it declined to include them in the record.

We grant the COA on this issue, in that reasonable jurists could differ as to whether the district court, having requested the parties to submit deposition testimony in lieu of live testimony and having promised to review the deposition testimony, should then exclude the documents. Even if the court did not find the documents to be dispositive to its decision, the better practice would have been to admit the documents, if nothing else, so that Hoffman would have the benefit of these documents on appeal.

[20] But any error was harmless here. Even if we were to consider all of the requested documents, *see Burnett v. Lampert*, 432 F.3d 996, 1001 n.7 (9th Cir. 2005), it would not change our decision in this case. Testimony that Hoffman was being set up to take the fall for Williams's murder is highly

relevant for sentencing purposes. But, as noted above, none of the testimony at issue demonstrates that Hoffman did not knowingly and intentionally participate in Williams's murder. Nor do these documents affect our finding that no prejudice inhered from counsel's failure to pursue a diminished capacity defense; a finding of diminished capacity requires more than the influence of another to commit a crime. We thus find that any district court error in not expanding the record was harmless.

## IV.   Conclusion

For the foregoing reasons, we GRANT the habeas petition with respect to ineffective assistance of counsel during the plea bargaining phase, and we remand for proceedings consistent with this opinion. As stated above, we order the district court to direct the State to release Hoffman unless, within a reasonable time from the date of this opinion, the State offers Hoffman a plea agreement with the "same material terms" offered in the original plea agreement. On all other points, we affirm the district court.

**AFFIRMED IN PART, REVERSED IN PART.**